Abraham Teitelbaum v. Commissioner. Abraham Teitelbaum and Esther Teitelbaum v. Commissioner.Teitelbaum v. CommissionerDocket Nos. 40590, 71483.United States Tax CourtT.C. Memo 1960-11; 1960 Tax Ct. Memo LEXIS 281; 19 T.C.M. (CCH) 52; T.C.M. (RIA) 60011; January 29, 1960Abraham Teitelbaum, pro se. 180 West Washington St., Chicago, Ill. Julian Berman, Esq., and Warren Seieroe, Esq., for the respondent. TRAINMemorandum Findings of Fact and Opinion TRAIN, Judge: Respondent determined deficiencies in petitioners' income taxes and additions to the taxes*282 in the years and amounts as follows: Additions to TaxDocketYearDeficiency293(b)294(d)(1)(A)294(d)(2)40590 (Abraham Teitelbaum)1944$ 2,355.93$1,177.97194517,835.728,947.86194624,741.7612,370.88194745,063.2422,531.6271483 (Abraham and Esther194930,172.46Teitelbaum)195060,318.6630,159.33$3,374.381951139,544.9969,772.50$12,559.048,372.70 The main issues are: (1) Whether petitioner's net income for the years 1944, 1945, 1946, and 1947 should include his distributive share of Christmas bonus payments made by the Chicago Restaurant Association to the Teitelbaum and Melnick partnership in those years; (2) Whether the partnership of Teitelbaum and Melnick included in ordinary income capital gains of $5,500 in 1945 from the sale of real estate and $1,000 in 1947 from the sale of an interest in a syndicate; (3) Whether petitioner Abraham Teitelbaum is liable for the additions to the tax provided by section 293(b) of the Internal Revenue Code of 1939 for the taxable years 1946 and 1947; (4) Whether petitioners understated the distributive share of the ordinary net income*283 of the Teitelbaum and Melnick partnership on the joint returns filed by themselves for the years 1949, 1950 and 1951; (5) Whether petitioner Abraham Teitelbaum, in computing the gain upon the sale of the Douglas Building in 1951, overstated the basis of the building by $200,000; (6) Whether petitioners are entitled to any deduction on their joint income tax return for the year 1951 with respect to advances allegedly made to Radio Station WMOR, a corporation; (7) Whether $7,500 received by petitioner from Roosevelt College was taxable interest or a return of principal; (8) Whether the partnership of Teitelbaum and Melnick sustained a deductible farm loss for the years 1949, 1950 and 1951; (9) Whether petitioners are liable for the additions to the tax provided by section 293 (b) of the Internal Revenue Code of 1939 with respect to deficiencies in the joint income tax liabilities of Abraham Teitelbaum and Esther Melnick Teitelbaum for the years 1950 and 1951; (10) Whether petitioners are liable for the additions to the tax provided by section 294(d)(1)(A) of the Internal Revenue Code of 1939 for failure to file a declaration of estimated tax for the year 1951; and (11) *284 Whether petitioners are liable for the addition to the tax provided by section 294(d)(2) for substantial underestimation of the estimated tax for the years 1950 and 1951. Findings of Fact Some of the facts have been stipulated and are hereby found as stipulated. Petitioners, Abraham Teitelbaum, hereinafter referred to as Teitelbaum, and Esther Melnick Teitelbaum, hereinafter referred to as Melnick, were husband and wife during the years 1944 to 1951, inclusive. Teitelbaum resided in Chicago, Illinois, throughout the entire period. Melnick resided in Chicago, Illinois, until approximately the latter part of 1947, when she moved to California, where she resided continuously thereafter. Teitelbaum filed individual income tax returns for the years 1944, 1945, 1946 and 1947 with the then collector of internal revenue for the first Illinois district at Chicago, Illinois. Teitelbaum and Melnick filed joint income tax returns for the years 1949 and 1950 with the then collector of internal revenue for the first Illinois district at Chicago, Illinois, and for the year 1951 with the director of internal revenue at Chicago, Illinois. During the years 1944 to 1951, inclusive, Teitelbaum*285 and Melnick were attorneys at law, licensed to practice in the State of Illinois, and they practiced as sole partners under the firm name of Teitelbaum and Melnick. Federal income tax returns were filed by the Teitelbaum and Melnick partnership for the years 1944 to 1947, inclusive, and for the years 1949 and 1950 with the then collector of internal revenue for the first Illinois district, Chicago, Illinois, and for the year 1951 with the director of internal revenue at Chicago, Illinois. On May 31, 1944, the Tyted Co., hereinafter referred to as Tyted, was incorporated under the laws of the State of Illinois. Its original office was listed as Room 1313, 77 West Washington Street, Chicago, Illinois. Teitelbaum was its initial registered agent. Corporation income tax returns for the years 1944 to 1947, inclusive, were filed by Tyted with the then collector of internal revenue for the first Illinois district, Chicago, Illinois. No Federal income tax returns were filed by Tyted for the years 1949, 1950 or 1951. By the terms of its charter, the purposes for which the corporation was organized were: to own, manage, operate, buy, sell, mortgage and lease real estate and the improvements*286 thereon, and to exercise all other powers incidental to the ownership, management and operation of real estate. The duration of the corporation was perpetual. Its total authorized stock consisted of 1,000 shares of single class stock, with a par value of $50 per share. There were no preferences, qualifications, limitations, restrictions or special or relative rights in respect of the shares of stock. Before Tyted could begin business, the total 1,000 shares were to be issued for consideration of $50,000. On June 2, 1944, Tyted issued 1,000 shares of its capital stock. Teitelbaum and Melnick received 999 shares as joint tenants and Josephine Melnick received the remaining share. Teitelbaum and Melnick paid no consideration to Tyted for the stock they received. The ownership of the Tyted capital stock remained unchanged through December 31, 1947. On June 1, 1944, Tyted acquired a property located at 20 East Jackson Boulevard, Chicago, Illinois, commonly known as the Douglas Building. The fee title to the building was acquired from John C. Slade for a consideration of $39,000, which was paid concurrently with the transfer of title. Tyted acquired the leasehold interest in the Douglas*287 Building from the Missouri-Kansas Life Insurance Co. for a consideration of $5,000 paid at the time of purchase. Tyted, in connection with the purchase, paid a brokerage commission of $500. At the time of acquisition of title to the Douglas Building by Tyted there were unpaid real estate taxes assessed for prior years with respect to the building which were satisfied by Tyted by an aggregate expenditure of $98,011.94, which included amounts paid in compromise of real estate taxes, foreclosure redemptions, 1944 real estate taxes, and all expenses in connection with such action. $25,000 of the expenditure was paid in December 1944, and Tyted claimed this amount as a deduction on line 22 of its 1944 corporation income tax return. $52,137.19 was paid during the year 1945 and claimed as a deduction on line 22 of Tyted's 1945 corporation income tax return. On December 27, 1944, Tyted conveyed title to the Douglas Building to the La Salle National Bank as trustee under Trust No. 10625. The trust agreement provided that the beneficial interest in the property was in Tyted, and the power of direction was vested in Teitelbaum and Melnick. On April 24, 1945, Tyted acquired title to certain*288 property located at 408 to 426 South Michigan Avenue, Chicago, Illinois, which property included a building commonly known as the Fine Arts Building and a portion of buildings commonly known as the Auditorium Hotel and Auditorium Theatre, by special warranty deed from Northwestern Mutual Life Insurance Co. of Wisconsin. The purchase price of these properties was $750,000 made up of $150,000 in cash and a promissory note of Tyted secured by a mortgage on the property sold in the principal amount of $600,000. The $150,000 in cash was comprised by a $10,000 check, a cashier's check of the La Salle National Bank in the amount of $116,500 and a check drawn by the seller payable to Willoughby and Company, hereinafter referred to as Willoughby, in the amount of $23,500, which represented Willoughby's brokerage commission on the sale, which check was endorsed by Willoughby. Although record title to the Fine Arts Building and Auditorium properties was in the name of Tyted, Tyted's actual interest was an undivided one-half interest and Tyted was entitled to one-half of the income from such properties. The other one-half interest was beneficially owned by either Paul R. Simon or Bessie L. Simon. *289 On May 1, 1945, Tyted conveyed title to these properties to the La Salle National Bank as trustee under Trust No. 10693. The trust agreement provided that the beneficial interest in the properties was in Tyted, and the power of direction was vested in Teitelbaum and Melnick. Both the Douglas Building and the Fine Arts Building were operated by Willoughby, a real estate management firm. Willoughby arranged rental leases with tenants, collected all rents and other building income, procured and paid for all ordinary maintenance services and supplies, and accounted to the building owners on a monthly basis. In connection with the building management, Willoughby rendered separate monthly statements meticulously detailed with respect to each building. Those statements itemized all income received and all disbursements made and contained summaries showing the total income, total operating expense and operating profit for the month. Willoughby maintained separate bank accounts with respect to each building operated by it as agent. As to such accounts, only certain Willoughby personnel were authorized to sign checks. In connection with the Douglas Building, Willoughby maintained an account*290 at the La Salle National Bank in the name of "The Tyted Co., Willoughby & Co., Agent", for the period July 6, 1944, to October 5, 1945, at which time the name of the account was changed to "The Douglas Building, Willoughby & Company AGENT". This account is referred to hereafter as the Douglas Building Agency account. In connection with the Fine Arts Building, Willoughby maintained an account at the La Salle National Bank in the name of "The Fine Arts Building, Willoughby & Co., Inc. Agent". Such account is hereafter referred to as the Fine Arts Building Agency account. Except when authorized or directed by building owners, Willoughby did not make disbursements for such items as major repairs or improvements, real estate taxes, or mortgage payments. Also, Willoughby would disburse funds to the owner of the building or any other person to whom the owner directed a payment to be made. Normally such payments would be reflected on the monthly statements as a charge to the ownership account unless the owner directed the payment to be charged in some other way. Willoughby did not maintain records for the purpose of computing profit and loss or income tax liability but merely to show cash*291 receipts and disbursements. According to the books and records of Willoughby, the gross receipts and operating expenditures with respect to the Douglas Building for the year 1944 were as follows: Gross receipts$30,505.93Operating expenditures19,736.79 The amount of $10,769.14 was reported by Tyted on its 1944 income tax return as its operating profit with respect to the Douglas Building. Included in the $19,736.79 operating expenditures were $487.06 nondeductible expenses. The records of Willoughby did not reflect $3,892.95 additional expenses, nor $25,000 delinquent real estate taxes, due at the time the Douglas Building was acquired by Tyted, which was paid in December 1944 and entered as a deduction on Tyted's 1944 corporate income tax return. In connection with the acquisition of the Fine Arts Building by Tyted, an agreement was negotiated between Teitelbaum and the World Amusement Corporation, one of the building tenants, whereby the latter deposited $25,000 and received an extension of its lease for a ten-year period. The agreement provided that the tenant would renovate and decorate the premises and install new seats (the leased premises consisted of*292 a theatre) and that Tyted would refund out of the $25,000 deposit the tenant's outlays and expenditures but not to exceed $10,000. It was provided that such refunds by Tyted would reduce the amount of the tenant's deposit pro tanto. Subsequent to the acquisition of the Fine Arts Building by Tyted, the premises leased by the World Amusement Corporation were renovated and decorated and new seats were installed by the tenant. Shortly after the tenant completed renovating and decorating the premises, it received a refund of $1,920. This refund was made by check dated October 3, 1945, drawn by Willoughby, at Teitelbaum's direction, on the Fine Arts Building Agency account and charged to "decorating" expense. Shortly after the tenant installed new seats in the premises, it received a refund of $8,080, by check dated May 15, 1946, drawn by Willoughby at Teitelbaum's direction and charged to "alterations". According to the books and records of Willoughby, the gross receipts and operating expenditures with respect to the Douglas Building and the Fine Arts Building for 1945 were as follows: DouglasFineBldg.Arts Bldg.Gross receipts$79,304.86$167,088.61Operating expenditures47,629.4588,838.21*293 Included in the operating expenses were nondeductible expenses of $333.05 with respect to the Douglas Building and $3,445.37 with respect to the Fine Arts Building. Willoughby's records did not reflect expenses totaling $6,625.66 with respect to the Douglas Building and $22,072.14 with respect to the Fine Arts Building, nor the $52,137.19 delinquent real estate taxes due at the time Tyted acquired the Douglas Building, paid during the year 1945 and entered as a deduction on Tyted's 1945 corporate income tax return. Tyted reported $72,131.40 income representing the operating profits of the Douglas Building and its one-half share of the operating profits of the Fine Arts Building. Depreciation claimed by Tyted on its 1945 corporate income tax return with respect to the Douglas Building and the Fine Arts Building totaled $30,000, computed as follows: Cost orRemaining BasisEstimatedPropertyAcquiredOther Basisto Be RecoveredLifeDepreciationDouglas Bldg.1944$100,000$ 95,00020 yr.$ 5,000Fine Arts Bldg.1945500,000475,00020 yr.25,000 Tyted claimed an additional $20,687.94 expenses from the operation of the company for trustees' *294 fees, attorney's fees, interest, title charges, tax foreclosure, insurance, and Christmas gifts. An additional $3,000 deduction was claimed on line 21 of its 1945 corporate income tax return as interest on a bank loan. Tyted reported no net taxable income for either 1944 or 1945, but claimed a net operating loss for the year 1945 in the amount of $33,743.73. Teitelbaum received distributions from Tyted in the net amount of $4,512.94 during the year 1944 and in the amount of $6,062.57 during the year 1945. These distributions were not reported as income of either the Teitelbaum and Melnick partnership or of petitioner individually. The income and expenses with respect to the operation of the Douglas Building and the Fine Arts Building, respectively, during 1946 were as follows: Douglas Building Income and operating expenses per Willoughby's records: GrossOperatingOperatingMonthReceiptsExpensesProfitJan.$ 7,316.46$ 4,372.66$ 2,943.80Feb.8,643.024,398.024,245.00Mar.7,702.515,959.591,742.92Apr.7,642.203,676.723,965.48May9,294.933,891.355,403.58June7,950.813,945.664,005.15July8,374.694,863.213,511.48Aug.8,546.165,778.742,767.42Sept.8,504.463,698.084,806.38Oct.8,937.786,744.772,193.01Nov.8,735.924,294.464,441.46Dec.9,105.714,782.354,323.36Annual Totals$100,754.65$56,405.61$44,349.04Operating profit from Douglas Bldg. per Willoughby's$44,349.04recordsLess deductible items not reflected as operatingexpenses per Willoughby's records: Real estate taxes$12,060.56Depreciation2,736.23Other1,685.6816,482.47*295 Fine Arts Building Income and operating expenses per Willoughby's records: GrossOperatingOperatingMonthReceiptsExpensesProfitJan.$ 23,112.58$ 13,126.03$ 9,986.55Feb.22,345.0312,426.349,918.69Mar.23,094.1814,410.448,683.74Apr.30,972.1612,096.9718,875.19May21,088.8422,395.80(1,306.96)June23,337.8512,805.1810,532.67July28,842.2211,817.4517,024.77Aug.$ 22,297.80$ 11,456.65$ 10,841.15Sept.25,773.8713,487.9512,285.92Oct.33,454.2921,839.3711,614.92Nov.28,554.6817,938.4310,616.25Dec.25,711.5413,879.2411,832.30AnnualTotals$308,585.04$177,679.85$130,905.19Operating profit from Fine Arts Bldg. per$130,905.19Willoughby's records:Add: Refund of deposit World Playhouse Corp.8,080.00erroneously included in operating expenses as"alterations"$138,985.19Less deductible expenses not reflected in operating$23,299.67expenses per Willoughby's records: Mortgage interestDepreciation - Building11,187.45Furniture & Fixtures245.94Legal Fees522.60Insurance - Amortizable portion2,887.85Premiums paid and charged to operating expenses(4,554.90)Other349.4533,933.06*296 During the year 1946 amounts were withdrawn by check from the accounts of the Douglas Building, the Fine Arts Building, and the Tyted Co. for the benefit of Bessie Simon, Teitelbaum and Melnick, and Teitelbaum individually, as follows: Douglas BuildingDateCheck No.PayeeAmount1- 6-46457Willoughby & Co. (re Dr. Sachs Lab.)$2,500.008- 5-46621Teitelbaum & Melnick1,000.0012- 4-46731Carlson Sheet Metal (Hawthorne House)900.0012-16-46753Elwood Plumbing Co. (Hawthorne House)800.0012-16-46754Richard H. Frank (Hawthorne House)525.753- 1-46483Tyted Co., A.T. Special Acct.4,202.7411-19-46721Tyted Co., A.T. Special Acct.4,000.00Fine Arts Building3- 1-46409Tyted Co., A.T. Special Acct.6,732.415- 1-46505Teitelbaum & Melnick1,443.7911-19-46788Tyted Co., A.T. Special Acct.5,000.00The Tyted Co.3-29-46Plain CheckA. Teitelbaum500.003-30-46Plain CheckA. Teitelbaum400.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Fine Arts Bldg.2,000.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A. Teitelbaum150.004- 2-4643Bessie L. Simon1,500.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Mary Jacobs2,906.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Sarah Simmenberg2,906.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Stella Austin680.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Bessie Shapiro825.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A. Teitelbaum200.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Victor L. Schlaeger6,030.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Bessie L. Simon$2,377.165- 8-4651Bessie L. Simon4,050.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Ed. J. Barrett, Sec. of State25.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A. Teitelbaum800.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Mort Levin100.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A. Teitelbaum300.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Cash500.006- 4-46Plain CheckCash400.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Teitelbaum & Melnick500.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Bessie L. Simon840.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Bessie L. Simon1,885.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Chicago Convention Bureau100.008- 1-4662Teitelbaum & Melnick400.008- 2-4663A. Teitelbaum300.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Bessie L. Simon3,000.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Victor L. Schlaeger533.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Victor L. Schlaeger6,030.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Elmer E. Stults, Inc.2,300.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A. Teitelbaum100.009- 5-4669Bessie L. Simon1,500.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Joseph Salerno2,000.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A. Teitelbaum650.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La Salle Nat'l Bank2,001.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Bessie L. Simon2,714.0910- 9-4674American Drug Industries2,500.0010-12-4675A. Teitelbaum500.0010- 4-46Plain CheckPauline DeMartini3,000.0010-21-4676Bessie L. Simon1,505.5510-24-4677Bessie L. Simon500.0010-30-4678A. Teitelbaum700.0011-12-4679Bessie L. Simon2,500.0011-12-4680Bessie L. Simon2,565.3011-20-4681Bessie L. Simon2,000.0012-20-4682T.W.A.119.5511-21-46Plain CheckA. Teitelbaum, Special5,000.00*297 No part of the amounts represented by the above checks were reported as income of either the Teitelbaum and Melnick partnership or Teitelbaum, individually. Willoughby disbursed checks drawn on the Fine Arts Building Agency account and payable to the Northwestern Mutual Life Insurance Company pursuant to instructions given by Teitelbaum to Rachel Haynie, which checks represented payments of principal and interest to the mortgagee of the Fine Arts property during the years 1946 and 1947, as follows: Allocation per Willoughby & Co.Records and MonthlyStatementsDateCk. No.AmountPrincipalInterest1-31-46365$10,931.40$ 5,030.52$ 5,900.884-25-4649410,931.405,080.835,850.577-25-4662510,931.405,131.635,799.7710-28-4674810,931.405,182.955,748.45Total (1946)$20,425.93$23,299.671-30-4788710,931.405,234.785,696.624-29-47103110,931.405,698.245,233.168- 1-47117410,921.406,344.114,587.2910-28-47130510,931.406,407.554,523.85Total (1947)$23,684.68$20,040.92Tyted reported $61,446.92 as its income from the operation of the Douglas Building*298 and the Fine Arts Building for the year 1946. It claimed deductions of $30,000 for depreciation, $12,110.56 for taxes, and $1,250 for other items, including donations. Tyted reported net income of $18,086.36 and computed its tax as $4,059.86. It did not claim any loss carry-over from the operations of 1944 or 1945. Distributions totaling $56,255.27 were made by Tyted to Teitelbaum and Melnick during the year 1946. No part of this amount was reported as income by either the Teitelbaum and Melnick partnership or Teitelbaum individually for the year 1946. Income and expenses with respect to the operation of the Douglas Building and the Fine Arts Building for the taxable year 1947 were as follows: Douglas Building Income and operating expenses per Willoughby's records: GrossOperatingOperatingMonthReceiptsExpensesProfitJan.$ 8,790.92$ 5,897.29$ 2,893.63Feb.11,699.014,873.636,825.38Mar.10,960.324,790.836,169.49Apr.12,462.214,900.237,561.98May11,158.244,771.946,386.30June11,439.824,343.157,096.67July11,987.855,386.106,601.75Aug.11,536.905,889.445,647.46Sept.11,880.964,008.197,872.77Oct.11,869.384,364.917,504.47Nov.11,783.774,323.897,459.88Dec.13,164.695,301.817,862.88Annual Totals$138,734.07$58,851.41$79,882.66Gross income from Douglas Bldg. per Willoughby's$79,882.66recordsLess deductible items not reflected as operating$12,437.48expenses per Willoughby's records: Real estate taxesDepreciation2,736.23Other2,753.3917,927.10*299 Fine Arts Building Income and operating expenses per Willoughby's records: GrossOperatingOperatingMonthReceiptsExpensesProfitJan.$ 37,330.93$ 14,305.49$ 23,025.44Feb.28,851.0315,093.5513,757.48Mar.32,210.9214,790.1717,420.75Apr.39,032.3619,946.8019,085.56May30,843.2814,202.2416,641.04June31,203.4513,757.4217,446.03July34,528.5012,856.5821,671.92Aug.27,680.4118,530.339,150.08Sept.30,915.4218,050.2512,865.17Oct.39,754.1028,539.9611,214.14Nov.33,687.4629,996.263,691.20Dec.33,524.5120,752.4312,772.08AnnualTotals$399,562.37$220,821.48$178,740.89Operating profit from Fine Arts Bldg. per$178,740.89Willoughby's recordsLess: Lease deposit included in gross receipts1,000.00$177,740.89Add: Nondeductible disbursements erroneously charged$10,000.00to operating expenses per Willoughby's records: Paidto Tyted and charged to travel expensePaid to Paul R. Simon and charged to travel expense10,000.00Repayments on Willoughby loan charged to commission20,000.0040,000.00expense$217,740.89Less: deductible items not reflected as operating$20,506.00expenses per Willoughby's records: Mortgage interestDepreciation - Building7,848.25Furniture & fixtures245.94Real estate taxes35,928.60Other4,777.8069,306.59*300 Willoughby disbursed checks during 1947 which were drawn on the Douglas Building Agency Account and payable to Tyted or to the Teitelbaum and Melnick partnership and reflected on Willoughby's records and monthly statements as charges to the ownership account (Tyted) as follows: Payable to The Tyted CompanyDateCk. No.Amount1- 1-47764$ 657.081-16-477843,000.001-30-477941,500.002-13-478052,000.002-25-478162,000.002-26-478191,500.003-13-478304,000.004- 1-478511,264.545- 1-478811,413.245- 8-478824,000.005-19-479061,500.006- 1-47912742.596-23-47930500.00 *9-29-4710191,000.0010-27-4710491,000.0012-11-4711003,000.00$29,077.45Payable to Teitelbaum & Melnick6-12-47920$ 5,000.006-27-479341,000.007- 1-47940416.957- 8-479422,500.007-14-479483,000.007-29-479661,500.008- 4-479721,000.008-13-479793,000.008-21-479931,000.0010- 1-481025145.9511- 1-471057535.1411-14-471066$ 100.00 *11-24-4710821,500.0012- 1-471090560.75$21,258.79*301 During 1947 Willoughby disbursed checks which were drawn on the Fine Arts Building Agency account and payable to Tyted or to the Teitelbaum and Melnick partnership and reflected on Willoughby's records and monthly statements as charges to the ownership account (Tyted), as follows: Payable to the Tyted CompanyDateCk. No.Amount1-16-47861$ 5,000.001-28-478843,000.001-30-478882,000.002-11-479023,500.00 *2-13-479048,000.003-13-479524,000.005- 1-4710384,442.625- 8-4710398,000.005-19-4710702,000.009-29-4712641,500.00$41,442.62Payable to Teitelbaum & Melnick6- 1-471082$ 2,635.786-20-4711181,000.006-23-4711212,000.007- 1-471133703.568-12-471190450.99 *8-25-471216258.008-25-4712171,742.009-12-4712312,000.00$10,789.34On February 27, 1947, Tyted sold to Roosevelt College*302 its beneficial interest in the south fifty-two feet of the Fine Arts Building, which was the Auditorium Hotel and Auditorium Theatre portions, and legal title was conveyed to Roosevelt College by the La Salle National Bank. The consideration received by Tyted from Roosevelt College was as follows: checks dated February 6, 1947, and February 27, 1947, in the amounts of $10,000 and $142,000, respectively, and a promissory note payable to bearer in the face amount of $250,000. The value of the note was $200,000. The cost basis properly allocable to the property sold to the Roosevelt College, adjusted for allowable depreciation, was $293,673.72 and the expenses of the sale were $842.20. On May 1, 1947, pursuant to corporate resolution, Tyted assigned its interest under Trust No. 10693, which purported to be the entire beneficial interest in the Fine Arts Building, as follows: an undivided one-half interest to Bessie L. Simon and an undivided one-half interest to Teitelbaum and Melnick. The income and expenses with respect to the operation of the Fine Arts Building for the period January 1, 1947, to April 30, 1947, were as follows: Fine Arts Building (Period 1-1-47 to 4-30-47) *303 Income and Operating Expenses per Willoughby's records: GrossOperatingOperatingMonthReceiptsExpensesProfitJan.$ 37,330.93$14,305.49$23,025.44Feb.28,851.0315,093.5513,757.48Mar.32,210.9214,790.1717,420.75Apr.39,032.3619,946.8019,085.56Four MonthTotals$137,425.24$64,136.01$73,289.23Gross income from Fine Arts Bldg. per Willoughby's$73,289.23recordsLess: Lease deposit included in gross receipts1,100.00$72,289.23Less deductible items not reflected as operating$35,928.60expenses per Willoughby's records: 1946 real estatetaxes paid April 1947Trustee's fee - La Salle National Bank2,105.00Interest on mortgage5,696.62Depreciation (4 months)2,698.06Other1,309.94$47,738.32On or about November 7, 1947, Teitelbaum telephoned Rachel Haynie, the person in charge of the Douglas Building and Fine Arts Building accounts at Willoughby, from California and requested that Willoughby furnish him a letter showing payments during 1947 which were made directly to Tyted and to Teitelbaum and Melnick from the operation of the Douglas Building and Fine*304 Arts Building. In response thereto, Haynie prepared separate letters dated November 7, 1947, with respect to the Douglas Building and the Fine Arts Building showing distributions of net cash receipts of each building for the ten-month period ended October 31, 1947, as follows: DouglasFine ArtsPaid to:BuildingBuildingTyted Company$28,077.45$36,442.62Teitelbaum & Melnick15,952.0910,789.34Subsequent to receiving the above letters, Teitelbaum telephoned Haynie and stated that the figures in the November 1947, letters were not the figures he wanted. In meetings with Haynie and her assistant, Teitelbaum reviewed the work papers prepared by Haynie with regard to the distributions and pointed out which payments he wished reflected in the letters and which he wished omitted therefrom. Thereafter, Haynie, on behalf of Willoughby prepared letters dated December 4, 1947, with respect to each building showing the total of certain distributions as requested by Teitelbaum, viz.: DouglasFine ArtsPaid to:BuildingBuildingTyted Company$23,420.37$5,000.00Teitelbaum & Melnick9,012.845,703.56On or about December 17, 1947, Teitelbaum*305 advised Haynie that he had not received the letters dated December 4, 1947, from Willoughby and requested that new letters be sent to him. In accordance with his request Haynie, on behalf of Willoughby, prepared letters dated December 17, 1947, with respect to each building showing the total of certain distributions as requested by Teitelbaum. In substance, such letters differed from the letters of December 4, 1947, only in that the total of the indicated distributions from the Douglas Building to Tyted was increased by $3,000. This increase resulted from a distribution in that amount during the intervening period, i.e., December 10, 1947. The letters of December 17, 1947, indicated the following: DouglasFine ArtsPaid to:BuildingBuildingTyted Company$26,420.37$5,000.00Teitelbaum & Melnick9,012.845,703.56During 1947 Teitelbaum authorized Willoughby to withdraw $5,000 per month from the Fine Arts Building Agency account, as operating profits permitted, as repayment of the balance of a loan made by Willoughby for the acquisition of the Fine Arts Building. Thereafter, Willoughby drew four checks dated August 25, 1947, September 24, 1947, November 20, 1947, and*306 December 8, 1947, respectively, each in the amount of $5,000 on the Fine Arts Building Agency account payable to itself in repayment of the balance of the loan. At the direction of Teitelbaum, these amounts were recorded as commission expenses on the records maintained with respect to the Fine Arts Building by Willoughby. Pursuant to directions from Teitelbaum, Willoughby disbursed checks on June 20, 1947, in the amount of $10,000, and August 4, 1947, in the amount of $5,000, drawn on the Fine Arts Building Agency account and payable to the La Salle National Bank to be applied to the liability of Tyted for outstanding loans. These checks were reflected on Willoughby's records and monthly statements as charges to the ownership account. On or about October 15, 1947, Teitelbaum directed Haynie, Willoughby's bookkeeper, to draw a check on the Fine Arts Building Agency account in the amount of $10,000, payable to Tyted, and charge it to "administrative expenses." The check was drawn and charged as directed by Teitelbaum. The following schedules set forth in composite form the distributions made by Willoughby during 1947 out of the Douglas Building Agency account and the Fine Arts*307 Building Agency account, respectively, by checks payable directly to either Tyted or Teitelbaum and Melnick; the individual checks selected by Teitelbaum to be reflected on letters addressed to him by Willoughby; and the distributions omitted from such letters at Teitelbaum's direction, and, consequently, not reported on any income tax return. The schedules also include four checks payable to currency or Willoughby which represented repayments of prior advances by Willoughby but do not include checks payable to any other payees and do not include the check payable to Tyted in the amount of $10,000 dated October 15, 1947, purporting to represent travel expenses. With minor exceptions, all of the checks set forth in the schedules appear on the work sheets prepared by Haynie and submitted to Teitelbaum. Such work sheets also indicate the checks which were disregarded at Teitelbaum's direction in computing the distributions to be reflected in letters from Willoughby. All of the checks listed on the following schedules appear on the monthly statements rendered by Willoughby as distributions to the building owners. Douglas BuildingAmounts Reflected inDistribution From DouglasLetter Dated 12-17-47AmountNotBldg. Agency Accountand Returns FiledReportedTo TeitelbaumTeitelbaumon AnyDateCk. No.To Tyted Co.& MelnickTyted Co.& MelnickReturn1- 1-47764$ 657.08$ 657.081-16-477843,000.003,000.001-30-477941,500.001,500.002-13-478052,000.00$ 2,000.002-25-478162,000.002,000.002-26-478191,500.001,500.003-13-478304,000.004,000.004- 1-478511,264.541,264.545- 1-478811,413.241,413.245- 8-478824,000.004,000.005-19-479061,500.001,500.006- 1-47912742.59742.596-23-47930500.00500.009-29-4710191,000.001,000.0010-27-4710491,000.001,000.0012-11-4711003,000.003,000.00 *6-12-47920$ 5,000.00$5,000.006-27-479341,000.001,000.007- 1-47940416.95416.95 **7- 8-479422,500.002,500.007-14-479483,000.003,000.007-29-479661,500.001,500.00 **8- 4-479721,000.001,000.008-13-479793,000.003,000.008-21-479931,000.001,000.0010- 1-471025145.95145.9511- 1-471057535.14535.1411-14-471066100.00100.0011-24-4710821,500.001,500.0012- 1-471090560.75560.75$29,077.45$21,258.79$26,420.37 *$9,012.84$14,903.03*308 Fine Arts BuildingAmounts Reflected inDistribution FromLetter Dated 12-17-47Fine Arts Bldg. Agency Accountand Returns FiledAmount NotTo TeitelbaumTeitelbaumReported onDateCk. No.To Tyted Co.& MelnickTyted Co.& MelnickAny Return1-16-47861$ 5,000.00$ 5,000.001-28-478843,000.00$ 3,000.001-30-478882,000.002,000.002-11-479023,500.003,500.002-13-479048,000.008,000.003-13-479524,000.004,000.005- 1-4710384,442.624,442.625- 8-4710398,000.008,000.005-19-4710702,000.002,000.009-29-4712641,500.001,500.006- 1-471082$ 2,635.782,635.786-20-4711181,000.00$ 1,000.006-23-471121$ 2,000.00$ 2,000.007- 1-471133703.56$ 703.568-12-471190450.00450.008-25-471216258.00258.008-25-4712171,742.001,742.009-12-4712312,000.002,000.00$41,442.62$10,789.34$ 5,000.00$ 5,703.56$41,528.40*309 Teitelbaum prepared the 1947 corporate income tax return of Tyted and the partnership information return of the Teitelbaum and Melnick partnership and reported as gross income from the operation of the Douglas Building and the Fine Arts Building, the partial distributions from Willoughby as reflected in their letters dated December 17, 1947, as follows: Rental income per Tyted Co. return$31,420.37Distributions to The Tyted Co. indicated per Willoughby letterdated December 17, 1947: Douglas Building$26,420.37Fine Arts Building5,000.00$31,420.37Rental income per Teitelbaum and Melnick return$14,716.40Distributions to Teitelbaum and Melnick indicated per Willoughbyletter dated December 17, 1947: Douglas Building$ 9,012.84Fine Arts Building5,703.56$14,716.40Tyted claimed deductions of $30,000 for depreciation, $3,000 for interest, and $25 for taxes on its 1947 corporate income tax return. Tyted paid income taxes of $1,028.03 for the year 1947. Teitelbaum claimed no depreciation on the partnership return of 1947 for the period it held the beneficial interest in the Fine Arts Building. Petitioner had been hired as labor counsel*310 for the Chicago Restaurant Association in 1939 at a fee of $15,000 plus $5,000 for expenses. This was subsequently raised to $20,000 plus $4,000 for expenses, and later the fee became a straight retainer out of which petitioner was to meet expenses. The gross receipts from professional activity of the Teitelbaum and Melnick partnership, income from other sources, and deductions for the years 1944 to 1947, inclusive, as reported on the returns of partnership income, were as follows: 1944194519461947Professional$43,957.62$53,507.25$52,403.05$37,759.00ReceiptsOther Income14,716.40(Fine Arts)DeductionsWages & Salaries1,777.502,943.502,015.00990.00Rent2,074.652,096.382,453.673,230.90Repairs37.6519.53Taxes17.7729.4320.159.90Depreciation424.98424.98424.98Other18,823.9123,421.6224,881.8832,756.75Net Income$20,801.16$24,571.81$22,607.37$15,487.85 The item listed as "other deductions" on the tax returns included the following: 1944194519461947Telephone$ 760.46$ 731.57Water81.5176.83Bar Association55.0083.12Towels19.8019.80Court Costs & Reporter322.38267.05Supplies & Stamps762.54446.98$18,398.61 *$32,756.75 *Expenses incidental to business2,041.711,806.90Business trips3,715.964,086.99Contributions1,114.61Lawyers250.00750.00*311 1944194519461947Louis Romano$5,000.00$5,000.00$5,000.00Morris Teitelbaum4,000.004,000.004,000.00Taxicab fares400.00400.00400.00Entertainment - 3% of income1,318.731,605.221,572.09Taxes956.57Interest2,075.98Currency Exchange95.82In addition to the fee received from the Chicago Restaurant Association, Teitelbaum received Christmas gifts to cover additional expenses which the association considered that he incurred in his capacity as labor lawyer for the association, in the years 1944 to 1947, inclusive, as follows: 1944$2,00019452,00019462,00019474,000 These amounts were not reported as income on the partnership returns or individual returns filed for those years by Teitelbaum. On his individual income tax returns filed for the years 1944 through 1947, inclusive, Teitelbaum reported gross income, deductions, and net taxable income as follows: NetGrossDeductionsTaxableYearIncomeContributionsTaxesMedicalExemptionsIncome1944$10,400.0$ 893.30$ 969.94$ 2,000$ 6,537.340194512,285.911,500.002,5008,285.91194611,303.68500.001,000.002,5007,303.6819477,743.93500.001,037.521,112.803,0002,093.61*312 For each of the above years, Teitelbaum made payments on declarations of estimated tax, reported total tax due on his returns filed for those years, paid the balance due as indicated, or claimed overpayments on his returns for those years as follows: Payments onTotal TaxBalanceYearEstimated TaxLiabilityDueOverpayments1944$1,625.10$1,717.32$ 92.2219451,717.322,305.79588.4719461,954.351,663.55$ 290.8119471,663.55399.561,263.99Teitelbaum and respondent executed a series of consent agreements with respect to each of the years 1945, 1946 and 1947 pursuant to section 276(b) of the Internal Revenue Code of 1939, extending to June 30, 1952, the time within which the commissioner might assess additional income taxes for the years 1945, 1946 and 1947. On December 21, 1951, the respondent assessed deficiencies in income tax, penalties and interest thereon, pursuant to the provisions of section 273 of the 1939 Code, for each of the years 1944 to 1947, inclusive. On January 22, 1953, an indictment was returned in the District Court for the Northern District of Illinois, Eastern Division, by the Grand Jury, charging*313 Teitelbaum with attempting to defeat and evade the income taxes of Tyted for the years 1946 and 1947 (counts 1 and 2); the income taxes due and owing by himself for the years 1946 and 1947 (counts 3 and 4); and the income taxes of Melnick for the years 1946 and 1947 (counts 5 and 6); all in violation of section 145(b) of the Internal Revenue Code of 1939. Teitelbaum, upon his plea of not guilty, was tried before a jury which returned a verdict of guilty on each count of the indictment. Sometime in 1947 Teitelbaum became interested in acquiring a residence in California. He met the owner of a date farm, hereinafter referred to as the Date Farm, near Indio, California, was desired to sell his farm. Teitelbaum understood that the Date Farm had been operated at a profit during the war years, that the price of dates during that period was favorably high, and that the then owner had used the substantial residential facilities for extensive entertaining. The ten to eleven acre property consisted of a main house with a large high-ceilinged living room, about 45 feet by 60 feet, which contained two fireplaces, a guest house, swimming pool, pool house, servants' house, caretaker's house, Mexican*314 house for the farm laborers, 300 date trees covering about 6 or 7 acres, and about 2 1/2 acres of grapefruit. During the first years following the war, the price of dates had declined so that the operation of date farming and extensive entertaining at the Date Farm resulted in an overall loss for the most recent year. Teitelbaum was informed that this loss would be claimed as a business loss for tax purposes by the then owner. Petitioner contacted the Date Growers' Association in California and sought information concerning date prices. In 1947 there was a decline in the domestic price of dates due in part to importing of dates from foreign countries which began that year. In the early part of 1948 Teitelbaum and Melnick purchased the Date Farm for a total consideration of $127,372.09. Of the total purchase price, $21,000 was allocable to the land, $17,500 to the date trees and related improvements, and at least $88,872.09 to the residence and related improvements. Petitioner maintained two automobiles at the Date Farm. One, a station wagon, was used primarily although not exclusively, for farming operations, whereas the other, a Cadillac, was held primarily for personal use. Melnick*315 used the Date Farm as her personal residence from the time it was acquired although a house in Los Angeles was rented during the hot season because the heat became too intense. Petitioner realized a loss from the operation of the Date Farm during 1948 and deducted the full amount as a business loss on the partnership return filed for that year. In 1949 Teitelbaum became permanently separated from his first wife, petitioner Melnick, who resided continuously thereafter at the Date Farm. No adequate records were maintained by either Teitelbaum or Melnick for the operation of the date farming. Expenses and accounts of both the residence and the farming operation were commingled. Total expenses incurred during the period 1949 to 1951, inclusive, with respect to the Date Farm and the portion of those expenses properly allocable to the farming operation were as follows: Expenses Attrib-Totalutable to Farm-YearExpenseing Operation1949$25,886.97$12,108.76195026,900.289,468.55195125,991.9911,859.52Petitioners reported gross receipts from the operation of the Date Farm for the years 1949, 1950 and 1951 in the amounts of $9,330.80, $3,650, *316 and $3,250, respectively. Net operating losses attributable to the Date Farm for the years 1949 to 1951, inclusive, in the amounts of $15,511.67, $21,730.50, and $21,898.39, respectively, were claimed as losses from the operation of a business for tax purposes on the returns filed for those years. During the years 1949, 1950 and 1951, Teitelbaum and Melnick were partners in a partnership known as Teitelbaum and Simon. Together they were entitled to 50 per cent of the net income of the partnership. The Teitelbaum and Simon partnership filed partnership returns for the years 1949 and 1950 with the then collector of internal revenue, Chicago, Illinois, and for the year 1951 with the director of internal revenue, Chicago, Illinois. The partnership of Teitelbaum and Simon claimed a deduction on its 1950 return for the conversion of electricity in the Fine Arts Building from direct current (D.C.) to alternating current (A.C.) This conversion was accomplished pursuant to an ordinance of the City of Chicago. Although the conversion did not increase the value of the building as such, it did affect the amount which a buyer would be willing to pay for the building. The conversion from D. *317 C. to A.C. was completed during the year 1950. Commonwealth Edison Company of Chicago assumed a portion of the cost of conversion. The total cost of the conversion of the building was as follows: CONVERSION OF ELECTRICITY FROM D.C.TO A.C. PURSUANT TO ORDINANCECITY OF CHICAGOSums disbursed to: Mead Electric Co.$ 79,490.00Chicago Elevated Corporation32,918.00Vault21,577.00Total$133,985.00Portion assumed and paid by Commonwealth Edison$36,427.20Company Mead Electric Co.Chicago Elevated Corp.13,167.20Vault21,577.0071,171.40Balance$ 62,813.60Additional work at our expense17,138.06$ 79,951.66This liability discharged by the Commonwealth Edison$ 2,500.00Company taking a second mortgage in the sum of$79,951.66 dated 5-17-50 Additional disbursementsSpitz & Spitz, architectsWork2,000.00Extras700.00Total$ 85,151.66The amount of $79,951.66 was claimed as an expense on the tax return filed by the Teitelbaum and Simon partnership rather than as a capital expenditure. The respondent disallowed the amount of $79,951.66 as a deduction for the year 1950 and the additional disbursement*318 of $2,000 because it related to the conversion work from D.C. to A.C. The remaining $3,200 was not directly related to the conversion work. The Fine Arts property placed a second mortgage on the premises in the total amount of $79,951.66 to secure the payment of the balance of the conversion cost. This mortgage was executed by the La Salle National Bank as trustee at the direction of Teitelbaum. The Teitelbaum and Melnick partnership return filed for the year 1949 contains a deduction for salaries and wages which is $1,000 in excess of the amount paid. Teitelbaum paid Harry Novitsky $1,900 during the year 1949 for his services as a handy man and janitor of the Douglas Building. The following schedule shows general professional expenses claimed in the Teitelbaum and Melnick partnership return for 1949, the amount of those expenses allowed by respondent and the amount disallowed: ItemClaimedAllowedDisallowedEntertainment, Gratuities, etc.$ 4,778.99$0$ 4,778.99Travel5,341.37320.585,020.79Hotel Blackstone3,907.0703,907.07Other Hotels290.86101.21189.65Union Dues and Expenses re: Chicago4,802.593,852.59950.00Restaurant AssociationTotal$19,120.88$4,274.38$14,846.50*319 Total deductions claimed on the Professional Income and Expenses schedule for 1949 were $57,079.16, or which respondent disallowed $14,846.50, as indicated above. Expenses of the Teitelbaum and Melnick partnership for the year 1949 did not exceed $42,232.66. During 1949 Teitelbaum received three $2,500 payments of interest on the $250,000 note of the Roosevelt College. During that period Teitelbaum was negotiating with the College for the sale of the note. The note was sold in 1949 for $190,000. Teitelbaum reported the selling price as $197,500 on the return filed for the year 1949, but reported no interest income for that year. The capital gains schedule contained the explanation that the $7,500 interest was treated as principal pursuant to an agreement between the seller and purchaser. Respondent reduced the selling price of the note by $7,500 and increased the capital loss reported from the transaction to $10,000. During the year 1950, the amount of fees paid to Teitelbaum and Melnick by the Chicago Restaurant Association was increased to $101,200. The 1950 partnership return of Teitelbaum and Melnick includes in the schedule of professional receipts the following: Chicago Restaurant Assn.$101,200Less: Special Disbursement at direction of Association10,000$91,200*320 The return does not disclose to whom or for what purpose the $10,000 was paid; neither does the work sheet from which the accountant prepared the return. However, a separate work sheet of the accountant for 1950 contains the statement "Deduct To Dan Gilbert For Rest. Assn. $10,000.00" and the net amount of $91,200 is shown in the column containing the fees from the Chicago Restaurant Association. Teitelbaum had told the accountant that he, Teitelbaum, had made a campaign contribution, at the direction of the Chicago Restaurant Association, to Dan Gilbert, who was seeking election as Sheriff of Cook County. Teitelbaum had requested a repayment of $10,000 from the Chicago Restaurant Association, discussed the matter with one of the officers of the association and received the following reply: "This letter is to advise you that our Board of Directors will not authorize the repayment of the $10,000 which you gave to the States Attorney's Investigator, Mr. Dan Gilbert in 1950. As we discussed, probably the money was used in his political campaign for Sheriff of Cook County. "We understand that you needed him to help remove the pickets from the Regent Drug Store at the Sherman Hotel. *321 Also, you told me that the demand, made by Mr. Gilbert, was on the Association. "It has been the policy of the Chicago Restaurant Association, as you well know, that this expense, as well as expenses for union periodicals, subscriptions, dues, travel expenses, entertainment of union representatives and officials, strike expenses, hiring of additional attorneys, labor experts and all other expenses, in connection with your position as our labor counsel, are to be borne by you. These expenses are considered a part of your annual retainer fee." Your request for reimbursement is regretfully declined. Neither the officers nor members of the association knew of any actual payment of $10,000 to Dan Gilbert in 1950. Dan Gilbert was chief investigator in the States Attorney's office for Cook County, Illinois, in 1950, a position which he had held for 18 years. When he sought election as Sheriff of Cook County in 1950 he had a campaign fund of which he was in charge. He knew of no payment received from either Teitelbaum or his employees, Louis Romano or Eugene Bernstein, nor did he solicit funds directly from the Chicago Restaurant Association. Petitioner's attorney, Eugene Bernstein, *322 prepared the Teitelbaum and Melnick partnership returns and the joint income tax returns for the year 1950. On the return filed for the year 1950, Bernstein qualified his signature with the statement "Based on records submitted." Those returns were timely filed on March 15 following the close of the taxable years. Bernstein prepared schedules contained in the 1951 partnership return, but did not prepare all of the return or sign his name to the return as the party responsible for its preparation. The professional income schedule filed with the 1951 partnership return was prepared in a different manner than were the other schedules and filed as an original instead of a carbon copy as the other schedules were filed. At least part of the professional income schedule was prepared by Bernstein. Professional receipts from the Chicago Restaurant Association totaled $124,800 for the year 1951. This amount was reported in the following schedule of Professional Income and Expenses: ABRAHAM AND ESTHER M. TEITELBAUM 20 E. JACKSON BLVD. CHICAGO 4, ILL. ADDENDA: FORM 1065 YEAR 1951PROFESSIONAL INCOME: Chicago Restaurant Association$75,000.00Special Expense Allowance in49,800.00$124,800.00connection with retainer aslabor relations counselEdgewater Beach Hotel5,000.00Orrington Hotel480.00Georgian Hotel750.00Galler Drug Co.1,000.00Allerton Hotel2,500.00Harding Brothers & Williams3,000.00Schwartz and Cooper400.00DISBURSEMENTS:$137,930.00Salaries:Add. W. TaxAdeline Weiner$100.00$ 1,485.00$ 1,585.00Joan Dillon30.00270.00300.00Patricia Ann Kurey65.00585.00650.00Michael Romano100.00900.001,000.00GENERAL DEDUCTIONS:$ 3,535.00Attorney Fees: Eugene Bernstein$ 250.00Max A. Reinstein1,000.00Morris Teitelbaum4,000.00Charles Kirschbaum60.00Sutherland, Tuttle & Brennan12,500.00Sutherland, Tuttle & Brennan264.40Exp.Bar Associations: Chicago Bar Association90.00American Bar Association12.00Womens Bar Association10.00Illinois State Bar Association15.00Bank Charges - Exchange66.64National BankMeals - re: picking up checks2,447.89of clients, etc.Automobile Expense500.00Employment Agency Fee97.50Florist - Central Floral20.40Stationery150.00Passport10.00Postage50.00Telephone3,081.60Travel, Transportation,13,240.27Hotels, etc.Food 100 days at $10.001,000.00Typewriter Service17.50Union Dues and Expenses -17,000.00Labor Relations ExpertInvestigators Fees, etc.7,800.00Towels45.00Water98.39ADDENDA: FORM 1065 YEAR 1951(Page 2)Miscellaneous - Vault19.00Repairs - Furniture in Office506.00- M. Kane & SonTheo. S. Liss150.00Jos. H. Optner600.00Advertising in year book, etc.49,800.00- Cooks Union, BartendersUnion, Walters Union, Misc.Unions and for specialpromotional work among unions,union officials, union agents,and representatives ascontemplated in expenseretainer of Chicago RestaurantAssociation, and includedabove in professional incomesectionSpecial Police Work1,000.00Business Promotions,4,406.50entertainment of clients, etc.not included in above 5% of$88,130.00Total other Deductions$120,308.09*323 The total fee of $124,800 which Teitelbaum received from the Chicago Restaurant Association was intended to be adequate to meet expenses such as dues, entertainment, and request for advertising, when demand for them was made by other organizations dealing with the association. However, no specific amount was ever designated by the association as an expense allowance during the period 1949 to 1951, inclusive. In 1951 there were 12 local unions associated with the Local Joint Executive Board of the Hotel and Restaurant Employees and Bartenders International Union. Nine of these local unions did not publish ad books, buyers' guides or program books in 1951. Of these nine unions, one union had a fund raising affair, a dance. Three other unions had ad books. William Friedman handled the fund raising for the union which had the dance and two of the unions which had ad books. All such monies went directly through his hands. Friedman received no money from Teitelbaum or his associate, Louis Romano, both of whom he knew, in 1951. With respect to the only other local which maintained an ad book in 1951, it received no money from Teitelbaum for advertising in its year book or for any other*324 purpose in that year. Teitelbaum did not expend sums for advertising in union year books during the year 1951 as claimed on the return filed for that year. Teitelbaum personally prepared that part of the Professional Income and Expenses Schedule which indicated a breakdown between expense allowance and payment for services of the fee received from the Chicago Restaurant Association and the $49,800 deduction for advertising and special promotional work. Teitelbaum maintained a house in Chicago as a personal residence in the years 1949, 1950 and 1951. A portion of the amount deducted by him in 1951 for "Travel, Transportation, Hotels, etc." represented expenditures at the Blackstone Hotel, Chicago. Teitelbaum sold his interest in the Douglas Building in 1951 for $600,000. Of this amount $191,419.02 was reported as gain on the sale in the 1951 income tax return and included in Teitelbaum and Melnick partnership income for that year. On a schedule attached to the return, this gain was computed in the following manner: ABRAHAM AND ESTHER TEITELBAUM 20 East Jackson Blvd. Chicago 4, Ill. ADDENDA, FORM 1065, YEAR 1951SCHEDULE D: LONG TERM CAPITAL GAINProperty located at 20 East Jackson Blvd.Acquired 6/ - /44Sold 12/ 1/51Cost: Winston, Strawn & Shaw$ 39,000.00MissouriKansas Life Ins. Co. (Leasehold)5,000.00Baird & Warner500.00General property taxes, for period prior$25,000.00to acquisition:40,844.6113,000.005,646.295,646.2990,137.19Chicago Title & Trust Co.1,067.00La Salle National Bank Trustees fees347.00Attorneys fees - re: tax settlementJohn S. Boyle$ 4,000.00Darrow, Smith & Carlin2,500.006,500.00Subsequent Additions and Improvements:$142,551.191/16/48 Plumbing$ 515.001949 Construction of office, Room 110517,751.39Mail Chute890.00Ben Boshes, Contractor22,800.00South Shore Iron Works, West Wall203.00Granix Co., Front of Bldg.1,000.00American Glass Co.3,000.001950 Spitz & Spitz, Architects fees$ 2,300.00Granix Co.2,794.201948-51 Leasehold improvements2,855.341951 American Glass Co.3,000.00Ben Boshes, General Contractor5,500.00John Baretti & Co., Terrazo Contract550.00$ 63,558.93$206,110.12Less: Depreciation reserve 12-31-5131,255.17$174,854.95Sales Price$600,000.00Less: Expenses of sale, etc.Commission: Henry Kopp$ 1,500.00Al Sokolsky3,500.00$ 5,000.00Capital expenditures in connection with 20 E. Jackson Blvd. Bldg.$200,000.00as to costs and improvements not previously taken as an expenseor Capital items 5-1-44 to 12-31-51 - upon review of costs, Ifind the amount to exceed $200,000.00. Expenditures can beverified by Spitz & Spitz, Architects and others. Expendituresinclude additional costs in acquiring title, buying out associateon contract, attorney fees and other costs and expenses notheretofore deductedTotal Costs$374,854.95Expenses of Sale, Etc. (cont.)Allowance to purchaser in reduction of$ 6,000.00saleRevenue stamps419.10Title expenses1,454.50Exchange National Bank, Trustee's fees35.00Junior mortgage discount allowed to20,817.43$ 33,726.03purchaser on discharge of mortgageNet Proceeds on Sale$566,273.97Total Costs as Above374,854.95Net Capital Gain$191,419.02Junior Mortgage - Purchase money mortgage$130,753.96Less: Applied on prorations to purchaser6,436.53Net$124,317.43Discount subsequently allowed to20,817.43purchaser to discharge mortgageNet$103,500.00*325 As in the case of the Professional Income and Expenses Schedule, Bernstein prepared only part of the above schedule. Page 2 was prepared by Teitelbaum. Bernstein had prepared a complete Schedule D showing the capital gain for the Douglas Building. However, the complete schedule prepared by Bernstein was not submitted with the return. The information appearing on the first page of Schedule D as prepared by Bernstein included all costs and subsequent additions to the Douglas Building of which he had information. Bernstein understood that those items on page 1 represented the total basis of the Douglas Building. The depreciation schedule for the Douglas Building filed with the 1951 tax return is as follows: ABRAHAM AND ESTHER TEITELBAUM 20 East Jackson Blvd. Chicago 4, Ill.ADDENDA, FORM 1065, YEAR 1951AcquiredCostDEPRECIATION SCHEDULE: Building as per Engineering6- 1-44$68,405.73valuation report 1-20-49Additions: Plumbing repairs (as agreed R.A.)1-16-48915.00Additions to Building -Construction of Office Room 1105:Walsh Const. Co. (Genl. Contr.)$4,000.005-27-49Walsh Const. Co. (Genl. Contr.)1,890.006-28-49Walsh Const. Co. (Genl. Contr.)310.006-28-49Hamilton Glass Co.1,830.006-28-49Roberts Stage Elec. Co.650.006-28-49P. J. Brown, Plumbing770.006-28-49Lyons Co., Ceiling984.006-28-49Air Comfort Corp., Air2,270.006-28-49conditioningHawkins Elec., Fixtures232.676-28-49Hunter Clark, Ventilat'g164.816-28-49Ben Rose, Drape matr.468.756-28-49Condon Co., Hanging drapes162.856-28-49Beverly Tile Co.201.206-28-49Frank Bodach & Co., Couch503.806-28-49Spitz & Spitz, Architects1,530.006-28-49Redlin & Redlin, Painter301.256-28-49Installation 3 dble. door925.009- -49windows, aluminumAluminum Arch. Prof. Windows450.009- -49Covering Accoustel "B"94.0010- 4-4917,751.39Mail Chute, installation10- -49$ 890.00Ben Boshes12- -496,000.00South Shore Iron Works, west wall4- -50203.00Granix Co., front of bldg.4- -501,000.00Ben Boshes12- -4910,000.00Ben Boshes12- -496,800.00American Glass12- -493,000.00Spitz & Spitz, Achitect fees6- -502,300.00Granix Co.2- -502,000.00Granix Co.3- -50794.20LEASEHOLD IMPROVEMENTS: R. 1406-7 Lease 9-1-48 to 8-3-50(Agreed R.A.)10-27-48R-1408 Lease 4-1-49 to 3-31-50(Agreed R.A.)300.001301-5 Lease 4-1-50 to 4-30-534- -50775.793rd fl. Lease 5-1-50 to 4-30-524- -50902.69601-2 Lease 8-1-50 to 9-30-538- -50169.061005 Lease 2-16-51 to 3-31-56476.55903 Lease 2-1-51 to 1-31-53231.25*326 ADDENDA, FORM 1065, YEAR 1951Douglas BuildingReserveDepre.ReserveRate1-1-5119511-1-52DEPRECIATION SCHEDULE: Building as per Engineering4$17,785.49$2,736.23$20,521.72valuation report 1-20-49Additions: Plumbing repairs (as agreed R.A.)4.651127.6842.56170.24Additions to Building -Construction of Office Room 1105:Walsh Const. Co. (Genl. Contr.)Walsh Const. Co. (Genl. Contr.)Walsh Const. Co. (Genl. Contr.)Hamilton Glass Co.Roberts Stage Elec. Co.P. J. Brown, PlumbingLyons Co., CeilingAir Comfort Corp., AirconditioningHawkins Elec., FixturesHunter Clark, Ventilat'gBen Rose, Drape matr.Condon Co., Hanging drapesBeverly Tile Co.Frank Bodach & Co., CouchSpitz & Spitz, ArchitectsRedlin & Redlin, PainterInstallation 3 dble. doorwindows, aluminumAluminum Arch. Prof. WindowsCovering Accoustel "B"12 1/23,328.382,218.925,547.30Mail Chute, installation5$ 55.50$ 44.50$ 100.00Ben Boshes5.05303.00303.00606.00South Shore Iron Works, west wall5.27.0410.5617.60Granix Co., front of bldg.5.239.0052.0091.00Ben Boshes5.05505.00505.001,010.00Ben Boshes5.05343.40343.40686.80American Glass5.05151.50151.50303.00Spitz & Spitz, Achitect fees5.259.80119.69179.40Granix Co.5.299.00104.00203.00Granix Co.5.231.0041.3072.30LEASEHOLD IMPROVEMENTS: R. 1406-7 Lease 9-1-48 to 8-3-50(Agreed R.A.)R-1408 Lease 4-1-49 to 3-31-50(Agreed R.A.)50300.00300.001301-5 Lease 4-1-50 to 4-30-5353 1/3172.42258.59431.013rd fl. Lease 5-1-50 to 4-30-5250300.90451.35752.25601-2 Lease 8-1-50 to 9-30-5333 1/318.7556.3575.131005 Lease 2-16-51 to 3-31-5619.5127081.4381.43903 Lease 2-1-51 to 1-31-5350106.99106.99$23,627.89$7,627.28$31,255.17*327 ReserveAmortizedReserveDateAmount1-1-5119511-1-52AMORTIZATION SCHEDULE: Amortization - ExpenseFinancing: Commission: Irwin Jacobs & Co.$2,000.00Survey150.00Miscellaneous3.05C.T. & T. Co., Title charges,810.40etc.Total5- -48$2,963.45$777.91$296.35$1,074.2610 Year Loan - 5-15-48 to5-15-58Revenue Agent Paul Tillotson, hereinafter sometimes referred to as Tillotson, examined petitioner's joint income tax return and the partnership return of Teitelbaum & Melnick for 1951. Attempting to verify the $200,000 additional basis claimed on the sale of the Douglas Building in the 1951 Teitelbaum & Melnick return, Tillotson called on petitioner in September or October of 1953. Petitioner advised Tillotson he would get these records but nothing was made available on Tillotson's various visits until the fall of 1954. In the fall of 1954 petitioner referred Tillotson to Spitz & Spitz (petitioner's architects who handled some remodeling of the Douglas Building). Tillotson obtained a list from Spitz & Spitz in petitioner's handwriting. He borrowed the list together with the file, made copies of the*328 handwritten list and had a tabulation made of the petitioner's documents in Spitz & Spitz's file. In September 1955 Tillotson revisited Spitz & Spitz at which time they had no records, but when Tillotson returned in a few days Spitz & Spitz gave him a three-page handwritten list which had been obtained from petitioner. The three-page list of 1955 was almost identical with the earlier 1954 list. The following shows the two lists given to Tillotson: List ofList ofDescription of Item19551954Loss Banana Deal$ 35,000Edlin Loss - 30 N. Dearborn5,000Elevators$ 14,00014,000Elevator Doors1,5001,500A. T. Office, Rm. 110529,00029,000New Front35,00035,000Remove Cornice & Roof12,50012,500Freight Elevator3,0003,000New Motors2,5002,500Water Tanks Relined, etc.750750Roof2,0002,000Mail Chute & Inst'l1,0001,000Valves Rooms & 3 Tanks Lines1,0001,000Plumbing for 2nd Floor New Toilet500500Construction Work Basement for Shoe Store3,0003,000Stan Raddick Alley Guards500500Furniture in Edlin Office3,0003,000Furniture in A.F. of L. Office1,5001,500Furniture in Ladies Washroom175175Gears for Elevators 48 doors240240Painting Drop Cloths150150Const. Stock & Tool Room1,0001,000Tools, Stock, Paint, Brushes, etc.2,0002,000Electric Modernization First Floor2,800Drain Pipe (New)700700Remove Old Sprinkling System500500Taylor Trunk Penalty for Noncompletion of Front750750Kasnow Fur Allowance on Job1,5001,500Miscellaneous Improvements From 1944 to Dec. 1952 over60,00060,000Rest Rooms for Employees2,000Office1,000Sewers Street Tuck PointingArchitect4,280Total$185,045$220,565*329 Spitz & Spitz, architects, had conducted the remodeling of the office and the lobby of the Douglas Building. The lobby alterations included work done by Ben Boshes, general contractor, and the American Glass Company. The total amount spent by petitioner through Spitz & Spitz, architects, was approximately $60,000, of which about $40,000 was for the lobby and about $20,000 for the remodeling of an eleventh floor office. The cornice of the Douglas Building was removed by the United Construction Company under direction of Spitz p Spitz at a cost of $3,220. This amount was expensed in the 1949 Teitelbaum & Melnick return. Teitelbaum was required to obtain a building permit to enable him to have work done on the cornice, which permit cost two dollars. There were no extra payments for this permit. A mail chute, installed for a cost of $890, was added to the basis of the building on the 1949 return. Kasnow furriers rented space in the Douglas Building and had plumbing work done in that portion of the building rented by them, for which they paid the total bill. Teitelbaum allowed Kasnow furriers a $500 concession toward rental payments for the plumbing expenses. All costs incurred*330 in connection with the Douglas Building remodeling were either recorded as expenses by Willoughby (with the result that they were expensed on the Teitelbaum and Melnick partnership tax returns) or had been previously capitalized in tax returns filed for years prior to 1951. In addition to the two lists furnished Tillotson, by Willoughby or petitioner, Teitelbaum told Tillotson that a portion of the $200,000 was $60,000 extra legal expenses which he had incurred in connection with clearing back taxes for the Douglas Building upon acquisition. During 1951 petitioner repaid loans of $10,000 to Emil Wolper and $50,000 to William J. Bressler. In addition to repayment of the above loans, Teitelbaum paid Bressler $2,500 interest in 1951 on the loan liquidated in that year. During the year 1950 the stock of the Metropolitan Radio Corporation of Chicago, Inc., hereinafter referred to as Metropolitan, which owned and operated station WMOR, an FM radio station, was held by various individuals including Donald F. Kiesau and Daniel L. Toffenetti, officials of the Chicago Restaurant Association. Sometime in 1951 Kiesau, Toffenetti and others, aware that the corporation was proceeding to insolvency, *331 sold their stock to Teitelbaum at about ten cents on the dollar. Teitelbaum intended to help Kiesau and Toffenetti by taking the stock off their hands. Teitelbaum expended money out of the Teitelbaum and Melnick account for purposes of paying certain bills, salaries, and wages of Metropolitan. Additional checks were drawn on the Metropolitan account, some of which were not negotiated. Teitelbaum advanced a total of at least $48,289.83 to pay expenses of Metropolitan. Of this amount, $20,901.94 was deducted as expenses on the Teitelbaum and Melnick partnership returns for 1950 and 1951. On March 19, 1952, a petition was filed by Metropolitan in the District Court of the United States for the Northern District of Illinois to have it adjudicated bankrupt. On April 18, 1952, the United States District Court adjudicated Metropolitan a bankrupt. Included in a list of claims filed against Metropolitan was an item classified as loans from Teitelbaum in the amount of $71,213.18. On the joint 1951 individual income tax return filed by Teitelbaum and Melnick, a loss was claimed for the following item: "RADIO STATION W.M.O.R. I advanced the sum of $71,213.18 to discharge the payroll*332 debts, rent, taxes due to the government for Social Security and Withholding taxes of F. M. Radio Station, operated by myself. The corporate name was merely retained as a legal convenience and the station was never operated as a corporation. No income was received and funds were advanced by myself personally. 71,213.18" In September or October 1953, Teitelbaum gave to Paul Tillotson, the revenue agent investigating the Teitelbaum returns, an envelope which contained several papers, cancelled and uncancelled checks drawn on the Metropolitan bank account which had not been negotiated, and a typewritten list of expenditures entitled "STATION W.M.O.R." which totalled $64,334.74 1. The typewritten list represented checks drawn on the Teitelbaum and Melnick account and made payable to various individuals, as well as cash items. Of the total, the amount of $22,269.88 did not constitute expenses of station WMOR. In addition, $20,901.94 of the listed amount had been deducted previously by Teitelbaum and Melnick on the 1950 and 1951 returns. Teitelbaum did not file estimated tax returns for the year 1951. On September 27, 1955, an indictment*333 was returned in the District Court for the Northern District of Illinois, Eastern Division, by the Grand Jury, charging Teitelbaum with attempting to evade and defeat the joint income taxes owing by himself and Melnick for the years 1950 and 1951 (two counts). On August 29, 1956, Teitelbaum entered a plea of nolo contendere upon which he was found guilty on both counts by the Court. Judgment and order of probation was entered by the Court on October 4, 1956. In the statutory notices of deficiency for the years 1944, 1945, 1946, 1947, 1949, 1950, and 1951, respondent made the following adjustments in petitioner's net income, which adjustments were based upon respondent's determination of unallowable deductions and additional income: 1944Rental income - Douglas Building$ 7,363.25Receipts from Chicago Restaurant Association2,000.00Other adjustments74.90Total increase to partnership net income$ 9,438.15Increase in petitioner's distributive share (50%)$ 4,719.081945Rental income - Douglas Building$ 25,382.80Rental income - 50% interest in Fine Arts29,811.81$ 55,194.61BuildingReceipts from Chicago Restaurant Assn.2,000.00Other adjustments3,258.53Total increase to partnership net income$ 60,453.14Increase in petitioner's distributive share (50%)$ 30,226.571946Rental income - Douglas Building$ 27,866.57Rental income - 50% interest in Fine Arts52,526.06$ 80,392.63BuildingReceipts from Chicago Restaurant Assn.2,000.00Other adjustments3,720.13Total increase in partnership net income$ 86,112.76Increase in petitioner's distributive share (50%)$ 43,056.391947Rental income - Douglas Building$ 61,955.56Rental income - 50% interest in Fine Arts74,217.15BuildingTotal rental income$136,172.71Rental income reported14,716.40Increase in rental income$121,456.31Receipts from Chicago Restaurant Association4,000.00Long-term capital gain realized on sale of14,371.04portion of Fine Arts BuildingInterest income6,250.00Other adjustments5,094.86Total increase in partnership net income$151,172.21Increase in petitioner's distributive share (50%)$ 75,586.101949A. Teitelbaum & Melnick partnership directly1. Salaries and Wages (Douglas Building)$ 1,000.002. Maintenance, etc. (Douglas Building)1,900.003. General Expensesa. Entertainment & Gratutities$ 4,778.99b. Travel5,020.79c. Hotel Expenses4,096.72d. Union Dues and Expenses950.0014,846.504. Real Estate Tax Refund647.155. Farm Loss15,511.676. Interest Income (the capital loss reported7,500.00from this transaction was accordingly increasedfrom $2,500.00 to $10,000.00)Total$ 41,405.32B. Teitelbaum & Simon partnership7-A. Recovery of Fire Loss ($14,854.21 received$ 5,034.87less $9,819.34 replaced)7-B. Real Estate Tax Refund1,725.547-C. Reimbursed Conversion Costs ($29,459.1115,959.11received less $13,500.00 expended)$ 22,719.527-D. Less Additional Depreciation428.32$ 22,291.20One-half to Teitelbaum & Melnick$ 11,145.60Total of A and B aboveA $41,405.32B 11,145.60Total $52,550.92 (Statement attached to Notice ofDeficiency)1950A. Teitelbaum & Melnick partnership directly1. Professional Receiptsa. Chicago Restaurant Association$ 10,000.00b. Harding & Williams200.00$ 10,200.002. Interest Expense2,000.003. Entertainment4,141.004. Gratuities4,600.005. Travel - Transportation6,076.386. Hotels1,773.367. Union Dues and Expenses1,500.008. Investigation Fees, etc.7,875.009. Miscellaneous (political campaign)670.0010. Douglas Building - Expense and Amortization155.3811. Real Estate Tax Refund637.0112. Farm Loss21,730.50Total$ 61,358.63B. Teitelbaum & Simon partnership13-A. Conversion Cost from DC to AC$ 67,313.6013-B. Interest on Conversion17,138.0613-C. Real Estate Tax Refund1,698.44$ 86,150.1013-D. Less: Additional Salaries & Wages$ 10,000.0013-E. Additional Depreciation2,505.9112,505.91Net Adjustments to Teitelbaum & Simon$ 73,644.19One-half to Teitelbaum & Melnick$ 36,822.10Total of A and B aboveA $61,358.63B 36,822.10Total $98,180.73 (Statement attached to Notice ofDeficiency)1951Net income reportedLoss$ (9,771.13)A. Disallowed loss claimed by petitioner inconnection with radio stationWMOR71,213.18B. Increase of net long-term capital gain1. From sale of Douglas Buildinga. Improvements capitalized in 1950 and again in$ 8,500.001951b. Claimed additional cost unsubstantiated200,000.00c. Discount on junior mortgage20,817.43 *d. Financing cost understated *(646.22)$228,671.212. Disallowed loss on WMOR stock6,200.00Total$234,871.2150% thereof$117,435.60C. Teitelbaum & Melnick partnership income1. General deductions$ 77,406.772. Professional income understated300.003. Disallowed interest expense4,500.004. Rental income increased by overstatingInterest$ 2,500.00Amortization2,044.124,544.125. Farm loss disallowed21,898.39Total$108,649.28D. Teitelbaum & Simon partnership6-A. Conversion costs reimbursed$ 3,273.476-B. Attorney & professional expense disallowed500.00$ 3,773.476-C. Less additional depreciation3,862.44Total (Decreased income)$ (88.97)One-half to Teitelbaum & Melnick(44.49)Total of A, B, C and D above$297,253.57Net loss reported9,771.13Adjusted gross income$287,482.44Less: Standard deduction1,000.00Net income corrected$286,482.44*334 (Statement attached to Notice of Deficiency) Petitioners' failure to file estimated tax returns for the year 1951 was not due to reasonable cause but due to willful neglect. A part of the deficiency for each of the years 1946, 1947, and 1951 was due to fraud with intent to evade tax. No part of the deficiency for each of the years 1944, 1945, and 1950 was due to fraud with intent to evade tax. Opinion Docket No. 40590 Petitioner raised only three issues with respect to the years 1944, 1945, 1946, and 1947. For each of those years he specifically denied that a part of the deficiency for each of the years 1944, 1945, 1946, and 1947 was due to fraud with intent to evade the taxes. He alleged that certain bonus payments received from the Chicago Restaurant Association were gifts and not income, and he alleged that he had improperly included in ordinary income gain from the sale of a capital*335 asset. No evidence was submitted concerning the capital gain dispute. Therefore, the respondent must be sustained on that issue. The only evidence submitted concerning the Christmas bonuses established that they were not gifts, as alleged by petitioner, but reimbursements for expenses, which expenses petitioner deducted on the partnership tax returns filed for those years. The respondent has abandoned the fraud issue for the years 1944 and 1945. In his determination of deficiencies for 1946 and 1947, respondent included in the income of the Teitelbaum and Melnick partnership the net profits from the operation of the Douglas Building and the Fine Arts Building, and treated one-half of that amount as the distributive share of petitioner. This determination was based in part on the theory that the corporate entity, Tyted, was a mere sham. Petitioner does not contest this determination. As a result, the respondent's deficiency determinations for 1946 and 1947 are sustained in this respect. Respondent affirmatively plead in his answer that the Teitelbaum and Melnick partnership or Teitelbaum, individually, received distributions in the nature of dividends from Tyted, which were not*336 reported by either the partnership or Teitelbaum as income. In support of this theory, respondent placed in evidence a series of checks representing withdrawals from the Tyted account and from the operating accounts of the Douglas and Fine Arts Buildings, which checks were payable to a variety of payees, including the Teitelbaum and Melnick partnership and Teitelbaum individually. These checks are set forth in our findings of fact. The respondent determined that all of these checks, other than those payable to Bessie Simon, were for the benefit of either the partnership or Teitelbaum individually and, as part of his fraud determination, treated them as unreported income of petitioner or the partnership. We have found previously that these amounts in fact were unreported by either Teitelbaum or the partnership. However, included in the list of withdrawals were checks payable to persons other than the Teitelbaum and Melnick partnership or Teitelbaum individually. The respondent has offered no proof that these other checks were paid for the benefit either of the partnership or Teitelbaum. A different situation exists with respect to the checks made payable directly to the Teitelbaum and*337 Melnick partnership or to Teitelbaum individually. The fact that the checks were so drawn is prima facie evidence that the amounts involved were paid for the benefit of the recipients and, thus, their income. The petitioner has offered no evidence to the contrary. On the basis of the entire record, including petitioner's manipulation of Willoughby's reports with respect to Tyted, and the unexplained checks payable to either the Teitelbaum and Melnick partnership or Teitelbaum individually which checks were not reported in the income of either, we are satisfied that the respondent has established by clear and convincing evidence a pattern of fraudulent conduct on the part of petitioner with respect to 1946 and 1947, and we have found as a fact that a part of the deficiency for each of the years 1946 and 1947 was due to fraud with intent to evade the tax. This conclusion is amply supported by the record before us without regard to the additional evidence of petitioner's criminal fraud conviction by a jury with respect to both years. Docket No. 71483 The Date Ranch Losses Respondent determined that petitioner did not operate the farm as a business for profit and, therefore, that*338 the losses sustained from the operation were not deductible as business losses. Petitioner contends that the Date Farm was a business and that the losses are properly deductible. We agree with the respondent. Whether an enterprise is conducted as a business for profit is a matter of intention and good faith, and all the facts in a particular case are to be considered. American Properties, Inc., 28 T.C. 1100 (1957). The only evidence submitted by petitioner in this respect was his own testimony that the previous owner had made a profit, that the loss incurred by the previous owner was deducted as a business loss, that the loss incurred by petitioner for the first year, 1948, was deducted on his tax return as a business loss and this deduction has not been challenged, that petitioner incurred expenses in the operation of the Date Farm, and that petitioner realized some income from the sale of the dates but that the price of dates was less than he expected it to be. Petitioner kept few records. At the trial he submitted a mass of unsorted cancelled bills. From the evidence submitted, *339 it is clear that petitioner did not consider the date farming as a separate operation from the maintenance of comfortable living quarters. No effort had been made accountingwise to segregate the expenses of the residential facilities, which were substantial, from those of the farming operation. Moreover, petitioner made no effort to put the farming on a paying basis. See Dean Babbitt, 23 T.C. 850, 866 (1955). He spent little time on the Date Farm and, after separating from his wife in 1949, did not exercise managerial responsibility. There is no evidence concerning Melnick's efforts, if any, with respect to the Date Farm. On the basis of the evidence submitted, we cannot find that petitioner possessed a good faith intention to operate the Date Farm as a business for profit. The Electrical Conversion Expense Petitioner deducted $79,951.66 for conversion of the electricity in the Fine Arts Building in 1950. Respondent determined that the expense was capital in nature and deductible only through depreciation. Petitioner's primary basis for contending that the expense was not a capital improvement was that the conversion, pursuant to an ordinance of the City of Chicago, *340 did not enhance the value of the building. However, this Court has previously held that this factor is not the criterion which determines whether an expenditure is capital or ordinary and that necessary replacements or useful improvements may properly be capitalized and their cost amortized out of income of the years of their useful life, even though the market value of the whole property shows no perceptible increase. Bonwit Teller & Co., 17 B.T.A. 1019 (1929), affirmed and reversed on other issues, 53 F. 2d 381 (C.A. 2, 1931), certiorari denied 284 U.S. 690. We hold that the electrical conversion cost is a capital expenditure. Loss on Sale of Note to Roosevelt College Teitelbaum received three $2,500 payments from Roosevelt College during 1949, prior to the time he sold the note for $190,000. He contends that the $2,500 payments, by agreement of the parties, were treated as payments towards the sales price of the note, namely, $197,500, and that therefore the loss on the sale of the note amounted to $2,500. No evidence was introduced concerning*341 the agreement, which, respondent argues, did not exist, except petitioner's self-serving statement. On the basis of this record, we are unable to find that the note was not sold for $190,000 and that the three $2,500 payments did not constitute interest payments. The respondent is sustained on this issue. Contribution to Dan Gilbert Respondent disallowed the deduction of $10,000 in 1950 on the basis that this amount was not in fact contributed to Dan Gilbert's campaign fund. Petitioner introduced a letter written to him by an executive of the Chicago Restaurant Association, rejecting his request for a reimbursement of that amount because they intended that his fee include all such items. The letter itself does not establish that any such payment was in fact made. The letter establishes only that Teitelbaum made request for reimbursement. Members of the Chicago Restaurant Association testified that they had no knowledge of any such payment or contribution to Dan Gilbert. Gilbert himself testified, and he denied that he received a campaign contribution, or any other sum, from Teitelbaum, persons associated with Teitelbaum, the Chicago Restaurant Association, or members associated*342 with it. Petitioner was unable to introduce any concrete evidence that he paid $10,000 to Dan Gilbert. Petitioner testified that the money was paid in cash. On the basis of the evidence, we are unable to find that petitioner paid Dan Gilbert $10,000, or any lesser sum in 1950. Respondent determined that a part of the deficiency for the year 1950 was due to fraud with intent to evade tax. The basis of this determination is the disputed transaction with Dan Gilbert. Respondent argues that Teitelbaum deliberately caused the Chicago Restaurant Association to issue a letter to Teitelbaum rejecting his request for reimbursement of the $10,000, and that such letter is proof of fraudulent conduct. The letter becomes significant as evidence of fraud only if we disbelieve Teitelbaum, or if we believe Teitelbaum was in fact acting fraudulently. Respondent has the burden of proving fraud. Section 1112, 1939 Code. The entire evidence of fraudulent conduct amounts to contradictory statements by Teitelbaum and Gilbert. However, we can find no cause to either believe or disbelieve Teitelbaum or Gilbert in this respect. The doubts in the record which operate against the petitioner as to the deficiency*343 because the burden of proof is upon him are also effective to operate against the respondent upon the issue of fraud because the burden is upon him with respect to the latter issue. Arthur M. Godwin, 34 B.T.A. 485 (1936). We are unable to find from this evidence that a part of the deficiency for the year 1950 was due to fraud with intent to evade tax. Professional Income and Expense - 1951 Petitioner reported the amounts received from the Chicago Restaurant Association in 1951 in two separate categories, a straight fee of $75,000 and a special expense allowance of $49,800. The Association had originally retained petitioner in the late 1930's and at that time specified that he receive $5,000 as an expense allowance. Subsequent to that year, his fee was steadily raised, but no amount was designated as an expense allowance. Petitioner arbitrarily considered a consistent portion of the total fee to be an expense allowance, even though the Chicago Restaurant Association did not consider such to be the case. It was the intention of the Association that the fee be of sufficient size to enable petitioner to meet "special" expenses, requests, and union matters. Petitioner*344 deducted, under the heading of General Deductions, such items as Union Dues and Expense, Investigators Fees and Business Promotions which were connected with his activity as labor counsel for the Association. Nevertheless, he also deducted $49,800 as a catch-all expense for the same expenses. Teitelbaum's accountant had prepared a professional income schedule which was complete; however, Teitelbaum personally added the general deduction of $49,800. Petitioner offered no evidence in support of the claimed deduction, and we are satisfied from the record that he claimed the deduction with the knowledge that it was false and fraudulent and with intent to evade tax. Petitioner deducted $13,240.27 for travel, transportation, hotels, etc., for the year 1951, part of which was incurred by him while residing at the Blackstone Hotel, Chicago. Chicago was the location of petitioner's principal source of income. However, he also maintained a house as his personal residence there, and petitioner could not in any sense be considered "away from home" or in travel status while in Chicago. The expenses incurred while staying at the Blackstone Hotel were personal and not business, and, thus, not deductible. *345 Additionally, the petitioner has offered no proof that the respondent erred in his disallowance of any such expenses for the years 1949 to 1951, inclusive, and the respondent's determination in this respect is sustained. Gain on Sale of Building Petitioner reported net capital gain from the sale of the Douglas Building in the amount of $191,419.02. The sales price was stated on his return to be $600,000 and total costs to be $374,854.95. Included in the latter total was an expense item of $200,000 declared to be "expenses not heretofore deducted." The evidence clearly demonstrates the contrary. Many of the expenses which Teitelbaum included in the $200,000 figure had been previously deducted according to his instructions. Petitioner prepared the part of the schedule in question personally, and we are satisfied from the evidence that he did so with knowledge that the $200,000 item was false and fraudulent and with intent to evade tax. Radio Station W.M.O.R. Petitioner acquired the stock of the Metropolitan Radio Corporation from friends at a time when he knew the corporation was either insolvent or becoming insolvent. He advanced further amounts to the corporation to pay expenses*346 and deducted some of the advances on the Teitelbaum and Melnick partnership return as expenses of the partnership. He also claimed a business loss of $71,213.18 in 1951, in addition to those expenses deducted on the partnership return. No evidence was submitted concerning the uncollectibility of the advances, other than that a petition in bankruptcy was filed in 1952. The respondent determined that the loss of $71,213.18 was not incurred in 1951. We cannot find from the evidence that the loss, if any, occurred in 1951, and the respondent's determination in this respect is sustained. Petitioners are not liable for the addition to tax provided by section 294(d)(2) for substantial underestimation of tax for 1951, for which year they did not file declarations of estimated tax. Commissioner v. Acker, 361 U.S. 87 (Nov. 16, 1959). Petitioner put at issue every adjustment which respondent made in the deficiency notices for the years 1949, 1950, and 1951. Certain adjustments have been agreed to by the parties, and these have been made a part of the findings of fact. Finally, other than with respect to the adjustments discussed above, the petitioner submitted no evidence worthy*347 of serious consideration. As a result, to the extent that any of the determinations of the respondent are not referred to specifically in this opinion, such determinations are hereby sustained. Decisions will be entered under Rule 50. Footnotes*. The checks drawn on 6-23-47 and 11-14-47 were drawn payable to currency and cashed by Willoughby in repayment of prior advances to Teitelbaum.↩*. Check drawn on 2-11-47 was made payable to Willoughby and the proceeds thereof received by Willoughby pursuant to the direction of Teitelbaum. The check drawn on 8-12-47 was made payable to currency and cashed by Willoughby in repayment of prior advances to Teitelbaum.↩*. Check No. 1100 in the amount of $3,000.00 was issued after the preparation of the worksheet and the letter dated 12-4-47. Hence, the totals on those documents regarding distributions to the Tyted Company are $23,420.37 rather than $26,420.37 as above. ↩**. These figures are components of the figure $4,416.95 appearing on the worksheet, which figure also included Check No. 942 in the amount of $2,500. The latter figure had been eliminated before preparation of letters dated 12-4-47 and 12-17-47.↩*. The $18,398.61 listed for the year 1946, and the $32,756.75 for the year 1947 were not itemized further than a statement that mentioned the categories which made up the total amount.↩1. Later adjusted by Tillotson to $70,559.71.↩*. The statement attached to the notice of deficiency contains two typographical errors. The $20,000.00 should read $20,817.43 and the word overstated should read understated. The net adjustment is in fact $228,671.21 as shown in the statement and upon which the tax was computed.↩